UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

DIANE CAVANAUGH,

                Plaintiff,           **MEMORANDUM & ORDER**
                                        21-CV-1381 (EK)(ARL)

         -against-

NORTHWELL HEALTH, INC.,

                Defendant.

------------------------------------x
ERIC KOMITEE, United States District Judge:

       Defendant Northwell Health hired plaintiff Diane Cavanaugh as a senior project manager in October 2017. Five months later, Northwell terminated her employment. Cavanaugh, who was sixty-three on the date of termination, alleges that Northwell fired her because of her age. She asserts one cause of action against Northwell: age discrimination in violation of the New York State Human Rights Law. The Court has diversity jurisdiction over this case.

       Northwell has moved for summary judgment. It argues that many of the facts on which Cavanaugh's claim relies are time-barred, and that the undisputed facts — including, indeed, key facts admitted by Cavanaugh herself — show that she was fired because she failed to perform adequately in the role, not because of her age. For the reasons below, the motion is granted.

# I.   Background

## A.   Factual Background

The following facts are drawn from the parties' Local Rule 56.1 statements and the exhibits appended to their summary judgment papers.  Unless otherwise noted, the facts discussed below are undisputed.[1]  Where a fact is disputed, and Cavanaugh has offered admissible evidence to support her position, the Court relies on Cavanaugh's view of events.  *Kirbaran v. Target Corp.*, 720 F. Supp. 3d 267, 271 n.2 (S.D.N.Y. 2024).[2]  And the Court of course "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor" of Cavanaugh.  *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009).

Northwell manages laboratories in the northeastern United States.  Pl.'s Rule 56.1 Counterstatement ("Pl. 56.1") ¶ 1, ECF No. 36.  The labs run clinical tests on bodily fluids and tissue specimens, and Northwell provides results at patient care centers.  *Id.* ¶ 3.  In the fall of 2017, Northwell planned to transition a major lab facility to a new "automated laboratory."  *Id.* ¶¶ 18, 41-42; Cavanaugh Dep. Tr. 210:18-211:2,

---

[1] Where the Court cites only one party's 56.1 statement, it is because the opposing party "either [has] not disputed those facts or has not done so with citations to admissible evidence."  *Kirbaran v. Target Corp.*, 720 F. Supp. 3d 267, 271 n.2 (S.D.N.Y. 2024) (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)).

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

ECF No. 35-2.  This would entail expanding into a larger space with additional instrumentation, as well as greater use of "robotic technology."  Pl. 56.1 ¶ 18.  Northwell referred to the new automated lab as the "Center for Advanced Medicine," or "CFAM."  *Id.*  The transition to CFAM was expected to create additional work for Northwell's Project Management Office ("PMO").  *Id.* ¶¶ 14, 19.  Cheryl Schleicher, the Director of the PMO, decided to hire a new senior project manager to handle that work.  *Id.* ¶ 22.

     1.   <u>Northwell Hires Cavanaugh</u>

       In the fall of 2017, Northwell posted a listing for the senior project manager position.  *Id.* ¶ 35.  Schleicher sought a candidate "with extensive experience who could provide expertise, leadership, mentorship and general guidance to the more junior and inexperienced members of the team."  Cheryl Schleicher Decl. ("Schleicher Decl.") ¶ 10, ECF No. 31.

       In September 2017, Nancy Barker — a third-party recruiter — asked Cavanaugh if she would like to apply for the senior project manager role.  Pl. 56.1 ¶ 36.  Cavanaugh applied, and Northwell sent Barker a job description for Cavanaugh to review before the interview.  *Id.* ¶ 39.  According to the description, the role required a bachelor's degree in information systems, medical technology, or a related field; a minimum of seven years of related systems analysis experience; a

minimum of four years of project management experience; that the applicant be knowledgeable about new systems and technology; and that the applicant have "[i]n-depth knowledge of [the] Health Care industry and related industries." Job Description 3, ECF No. 31-1. In bold, the description explained that part of the role involved "2 major projects to manage: relocation of 2 lab facilities to new locations, including physical move, security, infrastructure, applications, equipment, etc." *Id.* Cavanaugh does not dispute that one of those "major projects" was to manage the CFAM implementation. Pl. 56.1 ¶ 42.

Cavanaugh's resume indicated years of work experience at the intersection of IT and healthcare. Resume, ECF No. 31-2. She had worked as a systems analyst, product design engineer, or project manager at several firms that specialized in health care IT. *Id.* at 3-4. Indeed, Cavanaugh described herself as having "[i]n-depth knowledge of the healthcare industry and related industries" due to almost thirty years of work in healthcare IT. Cavanaugh Dep. Tr. 75:3-76:7, 170:16-24.

Cavanaugh submitted her resume to Northwell and met with Schleicher for interviews in September and October of 2017. Pl. 56.1 ¶ 50. During those interviews, Schleicher said the job was related to "a big lab project" — namely, the CFAM transition. Cavanaugh Dep. Tr. 147:12-21. Cavanaugh was hesitant about taking the position because she had "no lab or

operations background," although she believed that she was experienced in supervising people with subject-matter expertise that she lacked. *Id.* at 150:3-19. Schleicher explained that laboratory operations experience was "not essential" to be hired for the role. Pl. 56.1 ¶ 59. And Cavanaugh, in turn, assured Schleicher that she "understood healthcare operations and could quickly learn any new skills necessary to excel in the position." *Id.* ¶ 61.

The parties dispute whether the two women discussed age during the interview. According to Cavanaugh, Schleicher "made comments that she was close in age to [Cavanaugh]." *Id.* ¶ 73. Cavanaugh says Schleicher also told Cavanaugh she purposefully provided more "assistance and guidance to the 'kids,' meaning the younger employees." *Id.*

Northwell ultimately offered the job to Cavanaugh on October 11, 2017. *Id.* ¶ 81; *see also* Offer Letter, ECF No. 31-4.

2. Cavanaugh Works at Northwell for Five Months

Cavanaugh began work at Northwell on October 30. Pl. 56.1 ¶ 85. At that time, Schleicher advised Cavanaugh that she was subject to a six-month probationary period, during which she could be fired if she failed to perform. *Id.* ¶¶ 86-87. But as Cavanaugh acknowledges, Schleicher also touted her abilities. She told the PMO team she found Cavanaugh to be intelligent,

that Cavanaugh "had invaluable experience," and that she would be an "asset to the group." *Id.* ¶¶ 91-92.

The parties agree that Cavanaugh's job required her to understand the instruments in the Northwell laboratory and to oversee the "smooth transition of instrument data" to CFAM's computer network. *Id.* ¶ 107. But they disagree about how much initial training and guidance Schleicher offered. For example, Schleicher encouraged Cavanaugh to introduce herself to employees in the laboratory and each "relevant department" to learn how their needs intersected with the CFAM project and to "develop relationships with members of the Laboratory team." *Id.* ¶¶ 119-20. When Cavanaugh attempted to do so, however, she was — in her assessment — "often rebuffed and told by those employees that they did not want to work with her because she did not have lab experience." *Id.* Overall, Cavanaugh claims, Schleicher offered her little more than "general onboarding training" and "limited training . . . on lab operations." *Id.* ¶¶ 111-12. Cavanaugh attributes this inattention to Schleicher's belief that she did not have to "pay as much attention to [Cavanaugh]" relative to the more junior members of the team. Cavanaugh Dep. Tr. 249:18-24.

Around the same time she was onboarding Cavanaugh, Schleicher recommended that Northwell hire a junior project manager. Pl. 56.1 ¶ 94. The junior manager would handle

6

entry-level work, while Schleicher would assign more advanced work to Cavanaugh. *Id.* ¶ 96. Northwell eventually hired Alexandra Eberle for that position. *Id.* ¶¶ 97, 102. Eberle was not qualified to function as a senior project manager, and Schleicher asked Cavanaugh to train and mentor Eberle. *Id.* ¶¶ 104, 106.

Cavanaugh concedes that problems emerged shortly after she started work. She does not dispute Schleicher's sworn statement that members of the laboratory team complained to Schleicher about working with her, *id.* ¶ 129, though she asserts that she was not "made aware" of those complaints in real time. *Id.* ¶ 129.1. She also accepts that laboratory team members reported that meetings with her were inefficient and unproductive; that she failed to grasp basic concepts; that she was difficult to work with; and that she asked the same questions numerous times. *Id.* ¶¶ 129-31. Perhaps even more notably, Cavanaugh does not dispute Schleicher's — or a second Northwell employee's — sworn statements that she "never became technically competent with Northwell's programs." *Id.* ¶ 144. Instead, she attributes this failure to a lack of training and guidance from Northwell. *Id.*

3. Cavanaugh's Termination

In February 2018, Schleicher emailed the company's human resources director, expressing concerns about Cavanaugh's

7

performance.  *Id.* ¶ 183.  Schleicher eventually concluded that if Cavanaugh's performance did not "drastically improve," she would have to fire her.  *Id.* ¶ 185.  As Cavanaugh herself accepts, her performance did not improve.  *Id.* ¶¶ 144, 193, 195.  So, Schleicher filed a negative performance review in March 2018.  *Id.* ¶¶ 194-95; *see also* Performance Review, ECF No. 31-9.  The review stated that Cavanaugh was failing to meet expectations with respect to almost every aspect of her job, including all "manager-level competencies."  Performance Review 2.

Around two days after Schleicher filed that performance review, Northwell terminated Cavanaugh's employment.  Pl. 56.1 ¶ 196.  Cavanaugh accepts that her "inability to succeed in her position had nothing to do with her age, or anyone's perception of her age."  *Id.* ¶ 206.  She asserts only that Northwell misled her about the position's requirements, and did not provide her proper guidance or training, focusing instead on developing younger employees.  *Id.* ¶¶ 184, 206.1.

Northwell never hired a replacement for Cavanaugh.  *Id.* ¶ 208.

## B.  Procedural Background

Cavanaugh initially filed her complaint in New York state court.  Complaint, ECF No. 1-1.  Northwell removed on diversity grounds, *see* Notice of Removal, ECF No. 1, and

subsequently filed the instant motion for summary judgment.   In April 2024, the Court directed the parties to show cause as to its diversity jurisdiction under 28 U.S.C. § 1332.   *See* Docket Order dated Apr. 23, 2024.   The parties responded to that directive, *see* ECF Nos. 45-48, and the Court addresses the jurisdictional question below.

## II.   Legal Standard

Summary judgment is appropriate where there is no genuine dispute of material fact, such that the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   The movant must demonstrate that there is no such dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   The movant may do so by pointing out the absence of any evidence supporting "an element essential to [the non-movant's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The non-movant then has the burden of producing "specific facts showing that there is a genuine issue for trial."   *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998).

## III. Discussion

Northwell seeks summary judgment on Cavanaugh's age-discrimination claim under the New York State Human Rights Law ("NYSHRL").   It argues that the NYSHRL's three-year statute of limitations bars consideration of most of the facts underpinning Cavanaugh's claim, and that in any event, the

9

undisputed facts show that Northwell fired her because of her job performance, not because of her age.

**A.    Subject-Matter Jurisdiction**

Before addressing the merits, the Court first confirms its subject-matter jurisdiction. *Singh v. United States Citizenship & Immigr. Servs.*, 878 F.3d 441, 445 (2d Cir. 2017).

The Court's April show-cause order cited three potential defects in Northwell's removal. First, the pleadings did not allege Northwell's state of incorporation, which precluded a determination of complete diversity. *See Hertz Corp. v. Friend*, 559 U.S. 77, 85, 92-93 (2010) (for diversity purposes, a corporation is a citizen of its state of incorporation and the state where it has its principal place of business). Second, the pleadings did not specify Cavanaugh's domicile, stating only that she was a "resident" of Rhode Island. *See John Birch Soc. v. Nat'l Broadcasting Co.*, 377 F.2d 194, 199 (2d Cir. 1967) (statement of residence "tells the court only where the parties are living and not of which state they are citizens"). Third, the removal notice did not clearly allege an amount-in-controversy, even though Northwell (as the party invoking federal jurisdiction) had the "burden of proving that it appear[ed] to a reasonable probability that the claim [was] in excess of the statutory jurisdictional amount."

*Tongkook Am., Inc. v. Shipton Sportwear Co.*, 14 F.3d 781, 784 (2d Cir. 1994).

After reviewing the parties' responsive briefing, the Court concludes that it does have jurisdiction over this action. Northwell's general counsel submitted a sworn statement that the company is headquartered and incorporated in New York. Decl. of Laurence Kraemer ¶¶ 2-4, ECF No. 46. That is enough to conclude that Northwell is a New York citizen.[3] *See, e.g.*, *Greene v. Paramount Pictures Corp.*, No. 14-CV-1044, 2017 WL 4011240, at *3 (E.D.N.Y. Sept. 11, 2017) (relying on similar statements by corporate officers to assess existence of diversity jurisdiction). As for Cavanaugh's citizenship, she has now produced sufficient evidence, including an affidavit, indicating that she is domiciled in Rhode Island. *See* Aff. of Diane

---

[3] Diversity cases may not be removed to federal court where a party in interest "properly joined and served as a defendant is a citizen of the state in which the action was brought." 14C Charles Wright & Alan Miller, *Federal Practice and Procedure – Jurisdiction* § 3723 (rev. 4th ed.); *see also* 28 U.S.C. § 1441(b)(2). This rule might have barred removal in this case, given that Northwell is a New York citizen that removed from New York state court. However, in its removal notice, Northwell averred that it had not yet been joined or served in the state court action. *See* Notice of Removal ¶ 3. This turns out to matter, given the text of the home-state defendant rule: the rule is "inapplicable until a home-state defendant has been served in accordance with state law; until then, a state court lawsuit is removable under Section 1441(a)," even by the home-state defendant itself, "so long as a federal district court can assume jurisdiction over the action." *Gibbon v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019); *see also La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 97 (2d Cir. 2014) (defendant not properly named in complaint could still remove to federal court, even though that defendant had not appeared or been served). Moreover, even if Northwell had been properly served or joined under New York law at the time of removal, Cavanaugh has not moved to remand based on the home-state removal rule. Accordingly, any such argument is waived, because Section 1441(b)'s bar on home-state removal is "a procedural rule and [is] not jurisdictional." *Shapiro v. Logistec USA, Inc.*, 412 F.3d 307, 313 (2d Cir. 2005).

Cavanaugh ¶¶ 2-6, ECF No. 48-2.  This is sufficient to establish that she is a Rhode Island citizen, and that complete diversity therefore exists.  *John Birch*, 377 F.2d at 199 (failure to properly allege domicile can be cured "if there is anything on the record from which actual citizenship may be determined").

Finally, there is considerable record evidence suggesting that the amount-in-controversy exceeds $75,000.  *In re Elsa Designs, Ltd.*, 155 B.R. 859, 864 n.2 (S.D.N.Y. 1993) (court may look to whole record to determine if amount-in-controversy requirement is satisfied).  Among other things, Cavanaugh stated in an interrogatory response that she seeks more than $200,000 in back pay as damages.  *See* Pl. Responses to First Set of Interrogatories 3, ECF No. 45-6.

Having concluded that there is no jurisdictional impediment to doing so, the Court now proceeds to the merits.

**B.   Timeliness**

Northwell argues that most of the conduct to which Cavanaugh objects fall outside the NYSHRL's three-year statute of limitations.  Def. Mem. in Supp. of Summ. J. ("Def. Mem.") 25, ECF No. 33; *see also* N.Y.C.P.L.R. § 214(2); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 573 (S.D.N.Y. 2011).  This does not include her termination: Cavanaugh was fired on March 19, 2018, Pl. 56.1 ¶ 196, and initially filed this action in

state court on March 11, 2021.  *See generally* Compl.  So, the termination falls within the limitations period.

Cavanaugh's complaint does, however, arguably challenge two other employment actions that fall outside the limitations period.  First, Cavanaugh seems to allege that Northwell assigned her an excessive workload.  Compl. ¶ 47; *see Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) (assignment of a "disproportionately heavy workload" can constitute adverse employment action).  But this assignment allegedly occurred during her first week on the job — well outside the limitations period.  Compl. ¶ 47.  Second, she alleges that Northwell later assigned most of her tasks to Eberle.  Compl. ¶ 103; *see also Feingold*, 366 F.3d at 152 (an adverse employment action can occur when employer assigns the plaintiff "significantly diminished material responsibilities").  Yet, the complaint suggests that this occurred before January 2018, meaning that a claim of discrimination predicated on this action would also be untimely.  Compl. ¶¶ 103, 113.

So, Cavanaugh can pursue a discrimination claim as to only one adverse action: her termination.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (discrete acts occurring outside the limitations period are not independently actionable); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (same).

Nevertheless, conduct occurring outside the limitations period may still be used as "background evidence" in support of Cavanaugh's challenge to her termination. *Morgan*, 536 U.S. at 113; *see also Phillip v. City of New York*, No. 09-CV-442, 2012 WL 1356604, at *6 (E.D.N.Y. Apr. 19, 2012) (time-barred discriminatory acts may be cited "for example, as evidence of pretext"). Thus, we consider Cavanaugh's allegations concerning her (initially) heavy workload and (subsequently) diminished duties in assessing her claim of discriminatory termination.

In her briefing, Cavanaugh concedes that much of Northwell's conduct falls outside the limitations period. Pl. Mem. in Opp. to Summ. J. ("Pl. Opp. Mem.") 8-10, ECF No. 39. But she argues that the untimely conduct is still actionable under the continuing violation doctrine. That doctrine provides that where a plaintiff has experienced a "continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004). Basically, if a claim "by [its] nature accrue[s] only after the plaintiff has been subjected to some threshold amount of mistreatment," then the doctrine applies. *DeSuze v. Ammon*, 990 F.3d 264, 272 (2d Cir. 2021). The continuing violation doctrine remains "heavily

14

disfavored" in the Second Circuit, and courts will not apply it absent compelling circumstances.  *Trinidad v. New York City Dep't of Correction*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006).

The continuing violation doctrine does not apply here. "Where . . . plaintiffs complain of 'discrete acts' separated in time, the usual limitations rule applies."  *DeSuze*, 990 F.3d at 272.  Here, Cavanaugh alleges a series of "discrete acts" (e.g., her firing, or the reassignment of tasks to Eberle) that were each independently actionable, rather than a steady accretion of abuse that ultimately morphed into a legal claim.[4]  Thus, the normal limitations rule governs, and the statute of limitations bars consideration (other than as background evidence) of most of the alleged conduct.

## C.    The Age-Discrimination Claim

Cavanaugh argues that she was undertrained, set up to fail, and eventually fired because of her age.  Pl. Opp. Mem. 7. As noted above, only her termination falls within the NYSHRL limitations period.  So, the question before the Court is

---

[4] In her *brief*, Cavanaugh asserts that she also brought a hostile work environment claim.  Such claims are often continuing violations by their very nature.  *Morgan*, 536 U.S. at 115.  But Cavanaugh did not actually assert such a claim in her *complaint*.  Thus, she may not proceed on it now.  *See, e.g.*, *Auguste v. Dep't of Corrections*, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment").  This issue is discussed below. S*ee infra* at Section III.D.

simple: Could a reasonable jury conclude that Cavanaugh was fired because of her age?  The answer is equally simple: no.

Employment discrimination claims under the NYSHRL are subject to the familiar *McDonnell Douglas* burden-shifting framework.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  Under that framework, the "plaintiff bears the initial burden of establishing a *prima facie* case of discrimination."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008).  To do so, the plaintiff must show that she (1) "is a member of a protected class"; (2) "was qualified for the position [s]he held"; (3) "suffered an adverse employment action"; and (4) faced the adverse action "under circumstances giving rise to the inference of discrimination."  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

If the plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action."  *Holcomb*, 521 F.3d at 138.  If the defendant does so, the burden then shifts back to the plaintiff to show either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence" — i.e., that the defendant's explanation is pretextual.  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).

16

The plaintiff must demonstrate that discrimination based on a protected characteristic was the "but-for" cause of the adverse employment action.  *Gross v. FBL Fin Servs., Inc.*, 557 U.S. 167, 177 (2009) (holding that the but-for standard applies to discrimination claims under the Age Discrimination in Employment Act); *Downey v. Adloox, Inc.*, 789 F. App'x 903, 905 (2d Cir. 2019) (NYSHRL claims also require plaintiff to show "that age was the but-for cause of the challenged adverse employment action").

1.   Cavanaugh States A *Prima Facie* Case of Discrimination

Northwell argues that Cavanaugh has failed to show that her termination "took place under circumstances giving rise to the inference of discrimination."  *Ruiz*, 609 F.3d at 491.  As the Second Circuit has explained, however, "the evidence necessary to satisfy this initial burden [i]s . . . *de minimis*."  *Zimmermann v. Asscs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  Among other things, the mere fact that the "plaintiff's responsibilities were transferred to a younger co-worker" can suffice to establish a *prima facie* case.  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000).

Cavanaugh raises a genuine dispute of fact as to whether her responsibilities were transferred to a younger coworker.  Shortly after hiring Cavanaugh, Northwell hired Alexandra Eberle as a junior project manager.  Pl. 56.1 ¶ 102.

17

Eberle was "in her 30s." Cavanaugh Dep. Tr. 184:3-4. And though she offers little by way of specifics, Cavanaugh does claim that Schleicher "started peeling off [her] jobs and giving them to [Eberle]." *Id.* at 204:24-205:2. Thus, Cavanaugh has cleared the low bar of stating a *prima facie* case.

    2. <u>Northwell Offers A Non-Discriminatory Explanation</u>

        Northwell argues that it fired Cavanaugh because she "failed to perform her job functions as a [senior project manager] during her probationary period," not because of her age. Def. Mem. 15. If supported, that is a valid non-discriminatory purpose. And affidavits by fellow employees about a plaintiff's "unsatisfactory job performance and . . . poor attitude" are enough to articulate "a legitimate, nondiscriminatory reason for [a] plaintiff's termination." *Duffy v. State Farm. Mut. Auto. Ins. Co.*, 927 F. Supp. 587, 594 (E.D.N.Y. 1996) (Dearie, J.). Northwell has adduced such evidence.

        Both Schleicher and Amanda Campo (a member of the PMO team) submitted affidavits speaking to Cavanaugh's performance. Campo avers that Cavanaugh "had difficulty executing basic project management tasks or working independently." Campo Decl. ¶¶ 16, 26, ECF No. 30. She further claims that Cavanaugh "failed to participate in . . . team meetings," "did not take notes, ask questions, or actively engage with the team," and

would instead "sit silently or text on her phone." *Id.* ¶ 30. Throughout, Campo says, "Cavanaugh maintained a negative attitude, and constantly complained." *Id.* ¶ 31.  As already noted, Cavanaugh does not dispute that her colleagues made similar complaints contemporaneously to Schleicher (though she claims she was not aware of them at the time).  Pl. 56.1 ¶¶ 129-31.1.

        Schleicher's declaration tells a similar story. Cavanaugh "did not understand the intricacies of lab data and its relevance to patient care."  Schleicher Decl. ¶ 60.  And despite attempts to assist her, "Cavanaugh did not take initiative to improve her skills." *Id.* ¶ 61.  She "was not technically competent with Northwell's software applications," and "did not make any effort to learn the necessary skills or try to improve in this area." *Id.* ¶ 62.  Throughout, she "was consistently unprofessional.  She arrived to work late, would text / be on her cellphone during team meetings . . . and she would sit at her desk texting / on her cellphone, instead of working." *Id.* ¶ 64.  Schleicher avers that Cavanaugh's responsibilities were reassigned to Eberle not because Eberle was younger, but because "Cavanaugh was not getting any of her assigned work done." *Id.* ¶ 66.  For example, she claims that even when Cavanaugh was assigned the "very simple" task of

"implementing a scanning solution for paper / AP lab reports," she failed to manage it properly. *Id.* ¶ 65.

A contemporaneous email Schleicher sent to her supervisors at Northwell supports her account. February 9, 2018 Email, ECF No. 31-7. In that email, Schleicher explained that Cavanaugh "seem[ed] to struggle with understanding the lab instrument validation process" and asked "the same question repeatedly." *Id.* at 2. This aligns with Cavanaugh's own admission that she never became competent with Northwell's programs. Pl. 56.1 ¶ 144.

Given Schleicher's and Campo's affidavits, and Schleicher's contemporaneous email account (supplemented by Cavanaugh's own corroboration), a jury could reasonably conclude that Northwell had a legitimate, non-discriminatory reason for firing Cavanaugh.

3.   <u>Cavanaugh Fails to Show that Northwell's Explanation Was Pretextual</u>

The burden thus shifts back to Cavanaugh to show that Northwell's proffered reason for her termination was a "pretext for discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). This requires showing that, notwithstanding Northwell's stated reasons for firing her, Cavanaugh's "age was the reason that [Northwell] decided to act," that is, a "but-for cause of [Northwell's] adverse decision." *Lively v. WAFRA Inv.*

*Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (contrasting but-for causation under the ADEA with motivating-factor causation under Title VII); *Downey*, 789 F. App'x at 905 (analyzing ADEA and NYSHRL age-discrimination claims identically).

   a.   Northwell's Alleged Failure to Train
        Cavanaugh Cannot Establish Pretext

Cavanaugh mainly argues that, to the extent she fell short of expectations, she did so only because Schleicher misrepresented the role's responsibilities and neglected to provide her with the same "training or guidance" she provided to "younger colleagues." Pl. Opp. Mem. 15-16.  In her deposition, Cavanaugh maintained that Schleicher told her that "I don't have to pay as much attention to you, Diane, because you and I are in different positions and these kids are gonna go on and do something else." Cavanaugh Dep. Tr. 249:19-24.  She also asserted that Campo once told her that Campo was "very surprised that [Schleicher] hired an older woman because she had problems with [a former employee], who was also an older woman."  *Id.* at 251:19-23.

   This argument misses the point of the third *McDonnell Douglas* step, because it does not refute Northwell's non-discriminatory explanation for Cavanaugh's termination.

Northwell says it fired Cavanaugh because she was not performing. Cavanaugh agrees she was not performing. Pl. 56.1 ¶ 144. So, put simply, she does not dispute that Northwell had a genuine, non-discriminatory basis for firing her. And it is no defense for Cavanaugh to insist that she *would* have performed better if Northwell had expended additional resources training her. The ADEA (and by extension the NYSHRL) does not "require an employer to accord special treatment" to older employees. *Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982); *see also Testa v. CareFusion*, 305 F. Supp. 3d 423, 434 (E.D.N.Y. 2018) (Bianco, J.) ("[T]o the extent that plaintiff argues that his performance could have improved with more training, an employer is not obligated to provide such training.").[5]

Moreover, even if Cavanaugh received less training or attention than younger employees, she has adduced no evidence that her training regimen was based specifically on her age, as opposed to her level of industry *experience*. *See Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993)) ("[E]mployment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are [caused] by some feature other than the employee's age.").

---

[5] NYSHRL age-discrimination claims are treated identically to ADEA claims. *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018).

Indeed, *she herself* accepts that her failure at Northwell (which she attributes to a lack of training and guidance from Schleicher) had nothing to do with her age or Northwell's perception of her age.  Pl. 56.1 ¶ 206.

And even if that were not enough, Cavanaugh also fails to identify a similarly situated comparator — that is, a person with a similar level of experience who received more attention or training from Schleicher.  *See Lawless v. TWC Media Sols., Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012) (rejecting disparate treatment argument at third stage of *McDonnell Douglas* analysis because the plaintiff had not identified a similarly experienced comparator).  Cavanaugh accepts that her co-workers were less experienced than she was in project management.  Pl. 56.1 ¶¶ 88-90.  Thus, the undisputed facts suggest that, to the extent Cavanaugh received less training, it was because she was more experienced than her colleagues, not because she was older than them.  *See, e.g.*, *id.* ¶ 22 ("Schleicher determined that the team needed a [senior project manager] with extensive experience who could provide expertise, leadership, mentorship and general guidance to the more junior and inexperienced members of the team.").

      b.    The Changes to Cavanaugh's Workload Do Not
           Establish Pretext

      The changes in Cavanaugh's workload — i.e., the initial assignment of a heavy workload, followed by the reassignment of tasks to Eberle — also do not suffice at this stage.  Cavanaugh concedes in her complaint that her initial workload was "not exorbitant . . . for an experienced employee."  Compl. ¶ 47.  And she has identified no record evidence suggesting that Northwell assigned her these projects because of her age, rather than because (as both parties agree) it considered her an experienced employee capable of high-level tasks.  Pl. 56.1 ¶¶ 61, 74, 80, 92, 96; *see also Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 694 (S.D.N.Y. 2020) (assignment of increased course load to teacher was not actionable where it was "not a departure from normal academic practice" and was "consistent with her level of experience").  And in the end, the decision to reassign many of those tasks to Eberle was perfectly consistent with Northwell's stated reason for firing Cavanaugh: that she was not completing her work.  *Id.* ¶ 66.  Cavanaugh once again fails to identify any contrary evidence.

      c.    The Same-Actor Inference Cuts Against a
           Showing of Pretext

      Finally, Cavanaugh's argument runs headlong into the same-actor inference.  "[W]hen the person who made the decision

24

to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  Furthermore, "[t]he fact that the actor involved in both employment decisions is also a member of the protected class only enhances the [same-actor] inference." *Austin v. Ford Models, Inc.*, No. 95-CV-3731, 2000 WL 1752966, at *14 (S.D.N.Y. Nov. 29, 2000) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)).

Here, Schleicher (who was fifty-nine) recommended *both* hiring and firing Cavanaugh (who was sixty-two when hired and sixty-three when fired) within less than five months.  Pl. 56.1 ¶¶ 38, 72, 77, 196, 203-04.  Cavanaugh never explains why Schleicher would have recommended hiring her despite her age in October 2017, but then recommended firing her in March 2018 because of her age.

Accordingly, Northwell's motion for summary judgment is granted with respect to Cavanaugh's age-discrimination claim.

## D.    The (Alleged) Hostile Work Environment Claim

In her briefing, Cavanaugh asserts that she also brought a hostile work environment claim against Northwell.  Pl. Opp. Mem. 16.  But there is no separate heading for such a claim

in her complaint.  The complaint outlines just one "cause of action" for "[a]ge discrimination in violation of the [NYSHRL]." Compl. 18.  In fact, the phrase "hostile work environment" appears only twice in the complaint.  In one paragraph, Cavanaugh states that she complained to Barker about a "hostile work environment."  *Id.* ¶ 128.  And in the "cause of action" section, Cavanaugh mentions that Northwell "subjected [her] to a hostile work environment on the basis of her age."  *Id.* ¶ 152.

"The Court declines to rewrite [Cavanaugh's] complaint for [her]."  *Insured Advocacy Grp., LLC v. Spartan Servs. Corp.*, No. 23-CV-7212, 2024 WL 3876486, at *1 (S.D.N.Y. Aug. 20, 2024). Cavanaugh is represented, and thus not entitled to a liberal construction of her pleading.  *Id.*  Her complaint only clearly alleges one cause of action: age discrimination under the NYSHRL.  Compl. 18.  So, she may not now rely on two glancing references to argue that she also brought a hostile work environment claim.  *See Insured Advocacy*, 2024 WL 3876486, at *1; *cf. Urtubia v. B.A. Victory Corp.*, 857 F. Supp. 2d 476, 481 (S.D.N.Y. 2012) (dismissing claims without prejudice where plaintiff brought wage-and-hour claims under the New York Labor Law, but cited to inaccurate regulatory provisions).

Even if Cavanaugh had brought a hostile work environment claim, it would fail on the merits.  Hostile work environment claims under the NYSHRL are governed by the same

standard as claims under Title VII. *Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013). To prevail on such a claim, Cavanaugh must demonstrate that the conduct she challenges was (1) "objectively severe or pervasive — that is, . . . create[d] an environment that a reasonable person would find hostile or abusive," (2) "create[d] an environment that [she] subjectively perceive[d] as hostile or abusive," and (3) "create[d] such an environment because of" her age. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Although "[f]acially neutral incidents may be included . . . among the totality of circumstances that courts consider in any hostile work environment claim," the plaintiff must still offer "some circumstantial or other basis for inferring that incidents [age]-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

Cavanaugh argues that Northwell employees harassed her by denying her "assistance and resources due to her direct supervisor's noted preference for helping younger employees"; by "stripp[ing]" tasks "away from her in favor of a younger employee"; and by making "age-related comments." Pl. Opp. Mem. 17. Her only basis for inferring that otherwise neutral acts — like stripping her responsibilities and giving them to another employee — were motivated by her age are the alleged "age-related comments."

She identifies three such comments.  First, Cavanaugh testified that Schleicher had "referred to us as being close in the same age . . . at certain times."  Cavanaugh Dep. Tr. 155:5-10.  She never testified when or how these comments were made.  And given the similarity in age, it strains credulity to assert that the speaker intended these comments as disparaging — let alone "severely" so.  Second, Cavanaugh testified that Schleicher said to her that Schleicher did not "have to pay as much attention to you, Diane, because you and I are in different positions and these kids are gonna go on and do something else." *Id.* at 249:18-24.  Again, Schleicher is referencing herself, even in Cavanaugh's telling, which makes it less likely that the statement is derogatory.  And third, Cavanaugh testified that other, younger members of the team told her that "they were very surprised that [Schleicher] hired an older woman because she had problems with [another] older woman" employee.  *Id.* at 251:19-23.

These comments do not rise to the level of severe and pervasive harassment. Cavanaugh only identifies stray (and somewhat anodyne) remarks about her age.  She does not adduce evidence of the "steady barrage of opprobrious . . . comments" necessary to prevail on a hostile work environment claim.  *See Brenner v. City of New York Dep't of Educ.*, 659 F. App'x 52, 54 (2d Cir. 2016) (quoting *Tolbert v. Smith*, 790 F.3d 427, 439 (2d

Cir. 2015)) (occasional negative comments about "older, white, Jewish teachers" did not amount to pervasive harassment).[6]  So, Cavanaugh has failed to create a genuine dispute of material fact as to whether she was subjected to a hostile work environment, and Northwell's motion for summary judgment must be granted.

## IV.  Conclusion

For those reasons, Northwell's motion for summary judgment is granted.  The Clerk of Court is respectfully directed to enter judgment and close the case.


SO ORDERED.



_____/s/ Eric Komitee_____
ERIC KOMITEE
United States District Judge


Dated:    March 24, 2025
          Brooklyn, New York



---

[6] Beyond that, Schleicher's supposed comment that she and Cavanaugh were around the same age cuts *against* Cavanaugh's position, because it supports application of the same-actor inference.  *See Brown*, 82 F.3d at 658 ("The fact that the actor involved in both employment decisions is also a member of the protected class only enhances the [same-actor] inference.").